UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PROJECT ON GOVERNMENT OVERSIGHT, INC.**<br>1100 13th Street, NW<br>Suite 800<br>Washington, DC 20005<br><br>          **Plaintiff**,<br><br>v.<br><br>**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**<br>500 12th Street, S.W.<br>Washington, DC 20536-5900 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 220 and 2202, for injunctive, declaratory, and other appropriate relief. Plaintiff, Project On Government Oversight, Inc. ("POGO"), challenges the failure of the U.S. Immigration and Customs Enforcement ("ICE"), a component of the United States Department of Homeland Security ("DHS"), to provide POGO with all non-exempt documents responsive to three FOIA requests POGO filed with ICE seeking records concerning three people who died while in ICE custody in 2025.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3.  Venue lies in this district under 5.U.S.C. § 552(a)(4)(B).

## PARTIES

4.  Plaintiff POGO is a nonpartisan independent organization based in Washington, D.C. and organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. POGO's investigators and journalists take leads and information from insiders and verify the information through investigations using FOIA, interviews, and other fact-finding strategies.

5.  POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award, the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing Business Editing & Writing for its investigative series scrutinizing the government's oversight of offshore drilling. POGO extensively used records obtained under FOIA for both investigations. In 2023, POGO won a DC Dateline Award for excellence in journalism from the Society of Professional Journalists for work investigating conflicts of interest in the financial auditing industry. In 2024, POGO won a silver medal for investigative journalism podcasting at the New York Festivals Radio Awards, and was nominated for an Ambie Award for excellence in podcasting. In 2025, POGO received an honorable mention from the Association of Business Journalists' Best in Business Awards.

6. Defendant DHS and its subcomponent ICE are federal agencies within the meaning of FOIA, 5 U.S.C. § 552(f), and have possession, custody, and control of the records POGO seeks in this action.

## STATUTORY BACKGROUND

7. FOIA requires federal agencies, upon request, to make records "promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless one or more specific statutory exemptions apply.

8. The agency must provide the public records when they are requested in order "to ensure an informed citizenry, vital to the functioning democratic society." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

9. For non-expedited requests an agency must make a determination on a FOIA request within twenty business days and notify the requester of which of the requested records it will release, which it will withhold, and why, and the requester's right to appeal the determination to the agency head. 5 U. S.C. § 552(a)(6)(A)(i).

10. The twenty-day deadline for an agency to make a determination on a request begins on the earlier of: (l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

11. In "unusual circumstances," an agency may extend the time limits the FOIA prescribes by written notice to the person making such request that sets forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. The FOIA defines "unusual circumstances" as: (1) the need to search for and collect records from

separate offices; (2) the need to examine a voluminous amount of records required by the request; and (3) the need to consult with another agency or agency component. 5 U.S.C. § 552(a)(6)(B)(iii). No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

12. If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. 5 U.S.C. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

## FACTUAL BACKGROUND

13. ICE is responsible for securing the nation's borders and safeguarding the immigration system. Most of the immigration enforcement mission takes place within the U.S. border, rather than at or near the border. https://www.ice.gov/mission.

14. To fulfill the agency's mission, ICE oversees over 200 nationwide detention facilities that house people waiting for immigration proceedings or removal from the U.S. https://www.freedomforimmigrants.org/detention-statistics.

15. Officials make custody determinations on an individual basis, taking into account all facets of a person's situation, including their immigration history and criminal records, family ties, humanitarian issues, and whether that person may be a flight risk. According to ICE's own reporting from 2021 through 2024 fiscal years, more than a million immigrants went through ICE's detention centers across the country. https://www.ice.gov/statistics.

16. According to Transactional Records Access Clearinghouse ("TRAC")– Immigration, as of March 23, 2025, there are 47,892 ICE detainees across the country, a sharp rise of 21% from 39,703 as of January 12, 2025, marking a dramatic policy change in

immigration enforcement. https://tracreports.org/immigration/detentionstats/pop_agen_table.html.

17. In the first 50 days of the second Trump Administration, ICE made 32,809 enforcement arrests. To put this figure into perspective, ICE made 33,242 enforcement arrests in the entire 2024 fiscal year. https://www.dhs.gov/news/2025/03/13/ice-arrests-first-50-days-trump-administration.

18. With the Administration's efforts to increase immigration enforcement through arrests, detention, and deportation, DHS admits that its immigrant detention centers are now at or over capacity, housing about 47,600 individuals. DHS is now working with other federal agencies to increase bed space. https://www.nbcnews.com/news/latino/immigrant-detention-centers-are-capacity-trump-admin-officials-say-rcna196085.

19. ICE's Director told the press that they expect these ICE arrests and removal numbers to continue going up as they "unleash an agency that has had its hands tied behind its back for the past four years." https://www.nbcnews.com/news/latino/immigrant-detention-centers-are-capacity-trump-admin-officials-say-rcna196085.

20. In January and February 2025, three ICE detainees died in ICE detention, two of whom were at the Krome Service Processing Center ("KSPC") in Miami, Florida, and the third at the Eloy Detention Center in Eloy, Arizona. https://www.ice.gov/detain/detainee-death-reporting. For reasons of confidentiality and HIPAA regulations, names of the deceased individuals are not included in this complaint.

21. All three individuals received medical screenings upon entry into ICE detention, and two were cleared for the general population according to ICE's detainee death reports.

The death report for the third individual does not clarify whether he was cleared for the general population but does indicate that he had a normal physical exam and vital signs.

22. One of the three individuals ("Individual A") at the Eloy Detention Center, was seen by medical professionals for back pain on five occasions during the fall of 2024. Individual A started showing symptoms of fatigue, dizziness, and 20% weight loss. He was hospitalized on December 23, 2024, and died from complications of multiple infections, including tuberculosis, a highly contagious airborne disease, in the setting of human immunodeficiency virus ("HIV") on January 29, 2025. [1] https://www.ice.gov/news/releases/ethiopian-national-ice-custody-passes-away-phoenix-area-hospital.

23. Individual A did not receive specialized treatment for HIV or tuberculosis while he was in ICE custody. Routine bloodwork would have revealed his HIV status, according to Perry Halkitis, an expert in infectious disease epidemiology and professor of public health at Rutgers University. Halkitis and a second HIV expert said medical professionals should have noticed Individual A's severe infections and deteriorating health during the five medical visits to ICE medical professionals for back pain, and that he would have been visibly very sick given how far his HIV had progressed. HIV-positive people are particularly at risk of contracting other infections, such as tuberculosis, especially in the general population in detention environments. https://www.pogo.org/investigations/migrant-dies-in-ice-custody-from-untreated-hiv. Death from HIV is preventable with existing available treatment, and the life expectancy for HIV positive people is equivalent to that of the general population if given available treatment.

---

[1] Specific medical determinations and conditions were obtained from the individual's biopsy results from the County Medical Examiner's report, the same as the other two individuals. The reports can be provided upon court request for HIPAA reasons.

24.     The Eloy Detention Center was investigated by DHS' Office of Civil Rights and Civil Liberties (CRCL) 11 times between August 2022 and May 2023 for concerns about medical care and unsanitary conditions, and has issued 24 recommendations for improving detention conditions, medical care, mental health care, and environmental health and safety, according to a CRCL memo that was recently removed from DHS' website but made public by the Project On Government Oversight. https://www.documentcloud.org/documents/25866584-24-1216-crcl-close-summary-ice-eloy-detention-center-508/; https://www.pogo.org/investigations/dhs-removed-100-civil-rights-and-civil-liberties-records

25.     The Administration recently dismantled DHS' Office of Civil Rights, a primary oversight body through which deaths in ICE custody are investigated, rendering FOIA all the more critical for investigating and sharing information about deaths in custody. https://news.bgov.com/bloomberg-government-news/civil-rights-advocates-brace-for-cuts-in-homeland-security-unit.

26.     The health of another individual ("Individual B") at the Krome Service and Processing Center ("KSPC") declined rapidly after entering detention. This man started complaining of dizziness and had several fainting spells within days of arriving at the detention center, but did not receive a specific diagnosis for the cause of his symptoms, according to ICE's Detainee Death Report. He began experiencing disorientation, bizarre and aggressive behavior, and epileptic seizures. He was taken to the emergency room on multiple occasions in November and December 2024, with a range of symptoms. When he was eventually referred to a local hospital just over one month after arriving in ICE detention, he was diagnosed with "hyperosmolality (elevated level of solutes in the blood), hypernatremia (high concentration of sodium in the blood), organic catatonic disorder (neuropsychiatric

syndrome that affects consciousness, attention, perception, and memory), and rhabdomyolysis (breakdown of muscle tissues)." He died from complications of schizoaffective disorder on January 23, 2025. ICE's detainee death report does not indicate that Individual B was diagnosed with schizoaffective disorder while in detention or that he received any specific mental health consultation or treatment aside from "medication to treat his altered state." https://www.ice.gov/doclib/foia/reports/ddr-GenryRuizGuillen.pdf.

27. DHS' Office of Civil Rights and Civil Liberties issued a number of recommendations about KSPC in a March 2024 memo that was recently removed from DHS' website but made public by the Project On Government Oversight. That memo included 14 recommendations regarding the mental health impacts of use of force at KSPC. https://www.documentcloud.org/documents/25867583-24-0304-crcl-krome-north-spc-onsite-close-summary-508/.

28. The last individual ("Individual C"), also at KSPC, died just 17 days after he was admitted into ICE custody, despite ICE medical officials documenting his normal physical examination and vital signs during intake to the facility. Medical officials noted the man's elevated blood pressure during multiple visits with detention facility medical officials, though the detainee death report does not clarify whether he was given any blood pressure medication. The man died of a stroke. https://www.ice.gov/news/releases/ukrainian-national-ice-custody-passes-away-miami-area-hospital. According to the American Stroke Association, uncontrolled high blood pressure can cause strokes. The medical examiner's report for this man's death indicated that he was being held in a cell with 60 other people when he had a stroke.

29. These three deaths are alarming and demonstrate inadequate health care screening and treatment by ICE. In these cases, medical staff at the detention facilities failed to diagnose HIV, tuberculosis, and schizoaffective disorder. They failed to treat high blood pressure despite their knowledge of the condition, which is a known cause of stroke. ICE failed to take the necessary medical procedures to treat or monitor these individuals' health conditions, ultimately contributing to their untimely and possibly preventable deaths.

30. A House Committee on Oversight and Reform and Subcommittee on Civil Rights and Civil Liberty report in 2020 noted that there was a widespread failure to provide necessary medical care to detainees with serious and chronic medical conditions, to ensure sufficient sanitation practices, and to manage infectious diseases. These conditions, in combination with increased overcrowding at the detention centers due to the new administration's ramped-up enforcement actions, are breeding grounds for medical neglect, unchecked spread of infectious diseases, and ultimately, preventable deaths. https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2020-09-24.%20Staff%20Report%20on%20ICE%20Contractors.pdf.

31. The two detention centers mentioned in this complaint are particularly concerning. Eloy has a reputation as the "deadliest immigration detention center in the U.S." with a long list of problems, such as frequent suicide attempts, preventable deaths, excessive use of segregation, especially of people with serious mental illness, and inhumane living conditions. ICE has been "repeatedly accused of complicity in concealing the mistreatment and suffering that occur[s] within the walls of Eloy." https://www.detentionwatchnetwork.org/sites/default/files/reports/Anthology%20of%20Abuse%20%20A%20Legacy%20of%20Failed%20Oversight%20and%20Death%20at%20the%20Eloy%20Detention%20Center_.pdf.

32. According to a report by the American Civil Liberties Union, KSPC had the second highest number of deaths of any detention facility in the country between 2017 and 2024. Further, because the Administration is detaining immigrants beyond capacity, female immigrants are now housed in KSPC as well, which was originally reserved for men. These women reported that they were held "like sardines in a jar," with as many as 27 women in a small holding cell. They had to sleep on a concrete floor without daily access to a shower facility. https://www.usatoday.com/story/news/nation/2025/03/23/immigrant-women-hell-on-earth-trump-ice-detention/82029368007/. The advocacy group, Americans for Immigrant Justice, recently sent a report to the United Nations Human Rights Council listing the "egregious human rights abuses of immigrants at [KSPC]." The report includes testimonies from immigrants detained in [KSPC], including one man who said that he and other men "had to take turns sleeping . . . because there wasn't enough room for [them] to all lie down."

33. Lawmakers have recently voiced concerns about deteriorating conditions at KSPC. "People detained at Krome have faced alarming conditions, including prolonged confinement in unsanitary environments, lack of medical care, overcrowding, and mistreatment by staff," said a letter sent to DHS by U.S. Rep. Debbie Wasserman-Schultz (D-FL) and 48 other members of Congress on April 8, 2025. https://wassermanschultz.house.gov/news/documentsingle.aspx?DocumentID=3327.

34. The overcrowding issue stretches the contracted capacity at these detention centers and makes it hard to provide basic necessities, including beds and medical care, to the detainees. https://www.washingtonpost.com/business/2025/04/18/immigrant-detention-overcrowding-trump-crackdown/

*Plaintiff's March 13, 2025 FOIA Request*

35. On March 13, 2025, POGO's Senior Investigator, René Kladzyk, via the secure portal, https://www.securerelease.us/, filed a FOIA request on behalf of POGO regarding Individual A's death at Eloy Detention Center.

36. Specifically, Plaintiff requested all information, documentation, and correspondence about the following:

- The deceased detainee's medical intake screening and medical history, including information about all tests administered, and results of a tuberculosis test if one was administered.

- Materials related to a CRCL investigation into the individual's death.

- Materials related to clearing the individual for release into the general population on August 22, 2024, at Eloy.

- Materials from within the past year that mention "tuberculosis" and "Eloy Detention Center."

- Materials related to the notification of the Public Health, Safety, and Preparedness Unit of the ICE Health Service Corps regarding the individual's positive diagnosis of a highly communicable disease.

37. POGO requested a fee waiver for this FOIA request, explaining that it has no commercial interest in the requested records. The subject of the requested records concerns "the operations or activities of the government," specifically ICE and DHS, and the information is likely to contribute to both POGO's understanding and the public's understanding of government operations or activities. The contribution to such public understanding of ICE operations or activities will be significant because it will shed light on

ICE's internal operations, including healthcare and medical assistance, and chronic disease and infectious disease management which ultimately reflect on whether ICE ensures the immigrants detained at these ICE detention centers are being treated humanely, as claimed by ICE. Furthermore, the public has a close interest in ICE's infectious/communicable disease management because it will impact the public at large.

38. René Kladzyk, a Senior Investigator at POGO, submitted the request on behalf of Plaintiff. Ms. Kladzyk has published various articles in TIME Magazine, Kaiser Health News, the Texas Observer, among others, and has received multiple awards for her journalism at the 2022 Texas Managing Editors Awards. Her intended use of the requested information is to investigate and disclose the ICE detention centers' management of detainees' health and safety to contribute to public understanding of how ICE works, to increase governmental transparency to the public, and to hold the government accountable, ultimately. POGO will not profit from the information requested. 6 C.F.R. §5.11(k)(2).

39. POGO also requested expedited processing for this FOIA request, by demonstrating that the request, if not expedited, "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. §5.5(e)(1)(i), and there is an urgency "to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 6 C.F.R. §5.5(e)(1)(ii).

40. Plaintiff explained that Individual A died from a series of infectious diseases, including tuberculosis, which is a highly contagious disease, meaning that the Eloy Detention Center might be at risk of a widespread epidemic if proper procedures were not taken immediately, putting the detainees, ICE personnel and any other staff/visitors onsite, at risk.

Second, the requested information will likely reveal deficiencies in ICE's medical intake and subsequent medical monitoring and treatment practices

41. Calling the public's attention to this will hopefully put pressure on ICE and DHS to take swift action to address these issues, while leaving them unresolved may contribute to more preventable deaths and other health and safety hazards. This is particularly the case in the current Administration given its aggressive ramp up of immigration enforcement efforts. POGO is primarily engaged in disseminating information to the public and is therefore positioned to educate the public on this potential public health issue.

42. There is added urgency to inform the public about deaths in ICE custody in light of the dissolution of DHS' Office of Civil Rights and Civil Liberties, a primary oversight body that investigated deaths in ICE custody and complaints of civil rights violations, such as substandard medical care and unsafe conditions. In the absence of this office's oversight activity, FOIA is a primary vehicle through which the public can become aware of critical health and safety issues in ICE detention facilities. https://thehill.com/homenews/administration/5208342-dhs-eliminates-civil-rights-office/

43. In submitting this request, Plaintiff provided statements describing the above as the basis for the expedited processing request and certified the truth and correctness of the statement, as per 6 C.F.R. 5.5(e)(3).

44. ICE acknowledged receipt of the March 13, 2025 FOIA request on March 21, 2025. In addition, ICE invoked a 10-day extension for this request, as allowed by 5 U.S.C. 552(a)(6)(B).

45. In the same acknowledgement communication, ICE also denied POGO's request for a fee waiver, alleging that POGO failed to satisfy the criteria set forth in 6 C.F.R.§5.11(k)(2).

46. In the same acknowledgment communication, ICE denied POGO's request for expedited treatment, alleging that POGO has not satisfied either 6 C.F.R.§5.5(e)(1)(i) or 6 C.F.R.§5.5(e)(1)(ii).

47. Upon receiving the denial of the fee waiver request, POGO immediately appealed this decision, but the appeal board ruled on April 17, 2025, that the issue was not ripe for review because ICE has not assessed a fee and has not provided a final response to the March 13, 2025 FOIA request. Therefore, the appeal board remanded the request back to the ICE FOIA Office to complete processing POGO's original FOIA request.

48. Since that remand, ICE has provided no further communication and has not yet made a determination on the March 13, 2025 FOIA request.

*Plaintiff's March 25, 2025 FOIA Requests*

49. On March 25, 2025, POGO's Senior Investigator, René Kladzyk, via the secure portal, https://www.securerelease.us/, filed two FOIA requests on behalf of POGO regarding Individual B and Individual C's deaths at KSPC

50. Specifically, Plaintiff requested all information, documentation, and correspondence about the death of Individual B in ¶ 26 *supra*, including but not limited to:

- The individual's medical intake screening and medical history.

- Information about the individual's medical emergency on February 18, 2025, including: prescription and non-prescription medication prescribed or provided

before that date, information about narcotics found in his possession, nurse and Krome staff reports, and other documentation of the event.

- Correspondences including keywords "deceased individual's last name," and any of the following: "naloxone," "Narcan," "heroin," "opioid," "narcotic," "oxycontin," or "fentanyl."

- Information on whether medical staff at Krome possess naloxone /Narcan spray.

- Materials related to a CRCL investigation into the individual's death.

51.     Regarding Individual C mentioned in ¶ 28 *supra*, Plaintiff requested all information, documentation, and correspondence about his death, including but not limited to:

- The individual's medical intake screening and medical history.

- Information about the individuals' medical events leading up to his death, including but not limited to: prescription and non-prescription medication prescribed or provided, diagnosis after his initial medical screening, nurse and Krome staff reports, and other documentation of his condition.

- Correspondences including keywords: "his name," and any of the following: "diabetes," "blood sugar," "dehydration," "psychiatric," "psychotic," "suicide," "depression," or "epilepsy."

- Materials related to a CRCL investigation into the individual's death.

52.     As with Plaintiff's March 13 request, POGO requested a fee waver, citing the same arguments outlined in ¶¶ 37 and 38 *supra*.

53.     Plaintiff requested expedited processing for these requests. POGO explained that the failure to obtain information on an expedited basis about Individuals B and C's deaths

could pose an imminent threat to the lives and physical safety of other individuals detained and employed at the Krome Service and Processing Center given that there have been several detainee deaths at Krome in recent months.

54. Furthermore, the contractor running immigrant detention services at Krome has come under fire in recent weeks over unsafe and overcrowded conditions within this facility, *see* https://www.miaminewtimes.com/news/overcrowded-miami-ice-facility-seen-in-new-tiktok-video-22704351; https://www.usatoday.com/story/news/nation/2025/03/23/immigrant-women-hell-on-earth-trump-ice-detention/82029368007/.

55. On March 31, 2025, ICE acknowledged receipt of these two FOIA requests. In addition, ICE invoked a 10-day extension for this request, as allowed by 5 U.S.C. 552(a)(6)(B).

56. In the same acknowledgment communication, ICE denied POGO's requests for expedited treatment, alleging that POGO has not satisfied either 6 C.F.R.§5.5(e)(1)(i) or 6 C.F.R.§5.5(e)(1)(ii).

57. ICE also denied POGO's requests for fee waivers, alleging that POGO failed to satisfy the six factors set forth in 6 C.F.R.§5.11(k)(2).

58. To date, Plaintiff has not received any additional correspondence or update on the status of these requests, nor has ICE made a determination on these requests.

59. Under U.S.C. § 552(a)(6)(C)(i), Plaintiff has now effectively exhausted all applicable administrative remedies with respect to its three requests.

## PLAINTIFF'S CLAIM FOR RELIEF

### CLAIM ONE
### (Wrongful Withholding of Non-Exempt Records)

60. Plaintiff repeats and re-alleges paragraphs 1-59.

61. Plaintiff properly asked for records within the custody and control of the ICE and DHS.

62. Defendant, the ICE, wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for making a determination on Plaintiff's March 13 and March 25, 2025 FOIA requests of ICE.

63. Plaintiff POGO is therefore entitled to injunctive and declaratory relief with respect to the immediate processing and disclosure of the records requested in its March 13 and March 25, 2025 FOIA requests at no cost to POGO.

**CLAIM TWO**
**(Failure to Grant Request for Expedited Processing)**

64. Plaintiff repeats and re-alleges paragraphs 1-63.

65. Plaintiff properly asked that ICE expedite the processing of Plaintiff's March 13, and March 25, 2025 FOIA requests, which seek agency records in the possession, custody and control of ICE, based on its showing of the urgency because the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6. C.F.R. §5.5(e)(1)(i), and because the requests help POGO timely inform the public about an actual or alleged Federal Government activity, and that the request is made by a member of the media, 6. C.F.R. §5.5(e)(1)(ii).

66. Despite such a clear demonstration of the needs for expedited processing, ICE wrongfully denied these reasonable expedition requests.

67. Plaintiff has exhausted all applicable administrative remedies.

68. Plaintiff is therefore entitled to injunctive and declaratory relief with respect to the immediate and expedited processing and disclosure of the requested records.

### CLAIM THREE
### (Failure to Grant Request for Fee Waiver)

69. Plaintiff repeats and re-alleges paragraphs 1-68.

70. Plaintiff properly requested a fee waiver for each FOIA request, all of which seek agency records in the possession, custody and control of ICE, based on its showing that the subjects of these requests concern the operations of the federal government, and the disclosures likely will contribute to a better understanding of relevant government procedures by POGO and the general public in a significant way. *See* 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. §5.11(k)(2). Moreover, the requests are primarily and fundamentally for non-commercial purposes. *See*, e.g., *McClellan Ecological v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987).

71. Despite meeting all criteria for a fee waiver, ICE wrongfully denied all fee waiver requests.

72. Plaintiff has exhausted all applicable administrative remedies with respect to its fee waiver requests.

73. Plaintiff is therefore entitled to injunctive and declaratory relief with respect to the immediate and expedited processing and disclosure of the requested records, free of charge.

Respectfully submitted,

/s/Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, NW
Suite 640
Washington, DC 20015
(301) 717-6610
Weismann.anne@gmail.com

Dated: May 12, 2025                   *Attorney for Plaintiff*